```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
 2                        WESTERN DIVISION

 3

 4     CHARLES HOPSON, Dr., Ph.D.,

 5               Plaintiff,

 6        v.

 7     MIKE BEEBE, Governor of the
       State of Arkansas in his
 8     individual and official
       capacity; TOM KIMBRELL, Dr.,      No. 4:11CV00608 DPM
 9     in his individual and
       official capacities as            Wednesday, August 29, 2012
10     Commissioner, Arkansas            Little Rock, Arkansas
       Department of Education;          9:03 a.m.
11     JERRY GUESS, Dr., in his
       official capacity as
12     Superintendent Pulaski County
       Special School District;
13     DOES, John or Jane Doe,
       Numbers 1 through 100, in
14     their official and individual
       capacities,
15
                 Defendants.
16

17             TRANSCRIPT OF MOTIONS HEARING
         BEFORE THE HONORABLE D. PRICE MARSHALL JR.,
18                UNITED STATES DISTRICT JUDGE

19     APPEARANCES:

20     On Behalf of the Plaintiff:

21        MR. RICKEY H. HICKS, Attorney at Law
            415 Main Street
22          Little Rock, Arkansas  72201

23

24                                      [CONTINUED]

25
```

1    APPEARANCES CONTINUED:

2    On Behalf of Defendants Beebe and Kimbrell:

3        MR. SCOTT P. RICHARDSON, Assistant Arkansas Attorney General
            Arkansas Attorney General's Office
4            323 Center Street, Suite 200
            Little Rock, Arkansas  72201-2610

5

6    On Behalf of Defendant Guess:

7        MR. GEORGE JAY BEQUETTE, JR., Attorney at Law
            Bequette & Billingsley
8            425 West Capitol Avenue, Suite 3200
            Little Rock, Arkansas  72201-3469

9

10   Also Present:

11       MR. JEREMY LASITER, Attorney at Law, Arkansas Department of
     Education.

12

13

14

15

16

17

18

19

20

21

22

23

24       Proceedings reported by machine stenography; transcript
     prepared utilizing computer-aided transcription.

25

1          (Proceeding at 9:05 a.m., as follows:)

2               THE COURT:  Good morning, everyone.

3               MR. HICKS:  Good morning, your Honor.

4               THE COURT:  We are on the record in Case No.

5     4:11CV608, Hopson, Dr. Charles Hopson, against Governor Mike

6     Beebe and others.  We have here on behalf of Dr. Hopson

7     Mr. Hicks, Rickey Hicks.  Welcome.

8               MR. HICKS:  Yes, your Honor.

9               THE COURT:  And Dr. Hopson here as well from out of

10    town.

11         For various state defendants, we have Scott Richardson from

12    the AG's office.  Welcome.

13              MR. RICHARDSON:  Good morning, your Honor.

14              THE COURT:  And Mr. Lasiter is here as well.  Although

15    will you be speaking, Mr. Lasiter?

16              MR. LASITER:  No, your Honor.

17              THE COURT:  Well, glad to have you here today.

18         And Mr. Jay Bequette for the district.  Welcome.

19              MR. BEQUETTE:  Yes, sir.  Thank you.

20              THE COURT:  I have good news and bad news, in a

21    logistical sense.  My courtroom is getting upgraded

22    electronically and I'm going to turn on my microphone and try to

23    work with it here in a moment, but yesterday there was so much

24    feedback that I just had to turn it off and speak a bit more

25    loudly.  Y'all's microphones work, and so please use them.  You

1    can speak from the table or come to the podium, as you would

2    prefer.  But you may have to bear with me on me not having a

3    mike.  We'll see about that.

4        So maybe they got it fixed because I don't hear feedback.

5    That's a good thing.

6        We're here on a motion to -- motions to dismiss that were

7    filed some time ago by the defendants, and I have been tardy in

8    getting to them.  I appreciate counsel and the parties' patience

9    with me.  I also appreciate y'all coming for this on rather

10   short notice to have an oral argument.  I'm knee deep in the

11   issues in the case, and I thought it would be helpful to have a

12   conversation about them.

13       Mr. Richardson, you represent the movants, and I was

14   thinking about maybe 15 minutes opening from you on the state's

15   motion and then a five-minute rebuttal.

16       Mr. Bequette, maybe ten minutes.  Your issues seem more

17   discrete, and a minute or two of rebuttal if you need it.

18              MR. BEQUETTE:  Yes, sir.

19              THE COURT:  Okay.  And, Mr. Hicks, since you're --

20   since you've got to do battle with several, 20 to 30 minutes on

21   your side responding.  Would that be acceptable?

22              MR. HICKS:  Yes, your Honor.  It will.

23              THE COURT:  Good.  I don't anticipate ruling from the

24   bench at the end of the hearing.  I try to do that when I can,

25   as you all know, but these are very complicated issues and I've

1  started writing and thinking and reading, and my plan is, after

2  we finish up this morning, to get back to that and finish and

3  file an order in the case sooner rather than later.

4      So any questions about the ground rules or the procedure

5  this morning?

6          MR. HICKS:  No, your Honor.

7          MR. RICHARDSON:  No, sir.

8          THE COURT:  Okay.  Good.  I have a fairly full docket,

9  and, as I said, I anticipate us going about an hour, or maybe a

10  little bit more.

11      Mr. Richardson.

12          MR. RICHARDSON:  I'll come to the podium since I tend

13  to have a little bit of a quiet voice.  It will probably be

14  easier.

15          THE COURT:  I never thought of you as having a quiet

16  voice, Mr. Richardson.

17          MR. RICHARDSON:  I've had several court reporters tell

18  me that, so I try to help them out when I can.

19          THE COURT:  Very good.

20          MR. RICHARDSON:  One thing preliminarily for the

21  Court's information and kind of the posture of the district and

22  the state right now.  As the Court is aware, the district is in

23  fiscal distress.  The state has essentially taken it over,

24  basically put it in a receivership-type situation.  The statutes

25  give the state two years, the state and the district two years

1    to resolve the fiscal distress.  This is the beginning of the

2    second year.  So we have until June 30 of next year, June 30,

3    2013, to resolve the fiscal distress status.  If that doesn't

4    happen, then there are some pretty significant issues that will

5    have to be addressed.

6         THE COURT:  So it's at that point that the

7    reorganization issues come up, Mr. Richardson, about

8    dismembering, essentially?

9         MR. RICHARDSON:  Yes, your Honor.

10        THE COURT:  Okay.

11        MR. RICHARDSON:  We're all working to avoid that

12   result, but as things stand right now, that's our timeline and

13   June 30 is when we'll have to look at annexation, consolidation,

14   or perhaps reconstitution, although what we're here about is the

15   reconstitution that's already happened.

16        THE COURT:  I was going to say, why is the -- why is

17   that future and those possibilities, why is that material to

18   the -- to Dr. Hopson's lawsuit?

19        MR. RICHARDSON:  It's partly material, the district's

20   obligations and how it might impact the district in fiscal

21   distress, but we do have another case with the Court that it

22   would be probably more relevant for, and I just thought I'd take

23   the opportunity to let you know the status of it.

24        THE COURT:  Noted.  I appreciate it.

25        MR. RICHARDSON:  You're welcome.

1      I guess I will take my clients and go through the parties.

2   I find in these kind of cases it helps me to think through them

3   by party, and I've got Governor Beebe in his official and

4   individual capacity and Dr. Kimbrell in his official and

5   individual capacity.  The only allegations as to Governor Beebe

6   and the Governor's Office are that he consulted with

7   Dr. Kimbrell on the decision.  The ultimate decision is

8   Dr. Kimbrell's, but the Governor consulted with him.  I don't

9   see that as waiving any immunity that the Governor's Office

10  would have, sovereign immunity, and certainly qualified immunity

11  should apply to eliminate any claims against Governor Beebe in

12  his individual capacity.  I don't think there's any violation of

13  the law, it's simply for consulting with part of the Governor's

14  cabinet, Dr. Kimbrell.

15      In his official capacity, Dr. Kimbrell is immune, sovereign

16  immunity precludes this.  I think as your first question, your

17  order pointed up, if Dr. Hopson feels like he has a claim

18  against the state, he can go to the Claims Commission.

19          THE COURT:  May I interrupt?

20          MR. RICHARDSON:  Please do.

21          THE COURT:  A question about the scope of the

22  immunities.  Damages, settled law; right?  What about the claims

23  for injunctive and declaratory relief?  I know in your brief,

24  you cite the usual cases and refer kind of obliquely to relief

25  beyond damages, but isn't it the law that the immunity doctrines

1    don't shield against declaratory or injunctive relief as

2    long as the result of that is not money flowing out of the

3    treasury?

4              MR. RICHARDSON:  I might adjust that somewhat, but I

5    would initially note that I haven't seen *Ex Parte Young* invoked

6    yet by the plaintiff, so I usually don't start briefing *Ex Parte*

7    *Young* until the plaintiff invokes it and he hasn't done so here.

8    So that's why my references were oblique.

9         But I would say there are some limits on the injunctive

10   relief that's available.  First, it can't require out-of-pocket

11   money.  Second, it has to be something within the scope of the

12   official's ability to deliver and it has to be something that I

13   think if the official has discretion, then it's probably a

14   separation of powers issue, and with a federal court, it may be

15   a comity issue in ordering a state official to do something that

16   he has discretionary authority to decide.

17        Of course, before you even get there, you have to find that

18   there was a federal law violation.  I think as far as common law

19   or state law violations, there's a different set of law that

20   would have to apply with that.  I don't know that you get to go

21   the *Ex Parte Young* route for state law claims.  We would have to

22   look to the state law immunity and not Eleventh Amendment

23   immunity to decide the state law claims.  So under state law,

24   there is immunity from injunctive relief, and the only

25   exceptions are if the actions are ultra vires, arbitrary and

1    capricious, and bad faith.

2        So unless one of those things has been pled, which it would

3    be our position that they have not, Dr. Kimbrell is explicitly

4    statutorily authorized, especially as explained by the *Smith v.*

5    *Decatur* case, to take the actions that he took.  And so there

6    would be no opportunity to provide injunctive relief when he is

7    exercising statutory authority that he's been granted.

8            THE COURT:  That's responsive.  What about declaratory

9    relief?

10           MR. RICHARDSON:  I guess I'm not real clear on what

11   the declaratory relief would be in this case.  If it's a

12   declaration that Dr. Kimbrell violated the law, I think we've

13   addressed all that.  I don't think there's any -- I don't think

14   there's any federal law violations here.  Of course, they

15   attempt to invoke diversity jurisdiction, but that doesn't apply

16   when you sue a state.  There's no diversity jurisdiction as to a

17   state because a state is not a citizen of anywhere.

18           THE COURT:  But that's a sideshow, right, because of

19   the federal question jurisdiction?

20           MR. RICHARDSON:  Well, I agree that the first question

21   for the Court would be the federal claims and whether or not any

22   of the federal claims can survive.  If those don't survive, then

23   the typical policy in the Eighth Circuit is to let the state

24   claims go, and then they can do what they want with that.

25           THE COURT:  Absolutely, decline jurisdiction under

1    Section 1367.  Sure.  Sure.

2         MR. RICHARDSON:  Right.

3         THE COURT:  I've interrupted you, but I would welcome

4    in the course of your argument some discussion of the Arkansas

5    statute as it applies to Dr. Hopson's contract, in particular

6    the continued employment and the buyout wrinkle, which as my

7    earlier order indicated, the buyout wrinkle seems sui generis to

8    me.  I can't find any law about it either, and I need to know in

9    particular why the state defendants think that makes no

10   difference as between Dr. Hopson's case and *Smith*, for example,

11   or just in general of the director's powers under the statutory

12   scheme.

13        MR. RICHARDSON:  I think the reasoning in *Smith*

14   applies equally to a buyout position.  As I stated in my filing

15   yesterday, in the same way it would be anomalous to require a

16   district to keep a superintendent employed, keep paying him when

17   he's presiding over a district that has gone into fiscal

18   distress, it would be equally anomalous to pay him hundreds of

19   thousands of dollars when he is dismissed for presiding over a

20   district that has slipped into fiscal distress.

21        THE COURT:  Practically I hear you, but where is the

22   director's authority under the statute to void that particular

23   part of the contract without process that addresses that

24   particular issue?  I understand the argument and you've laid it

25   out well about how continued employment is really layered on top

1    of the fiscal distress issues and that that issue was in play

2    and everyone knew it was in play when the district is going

3    through the procedure and appeal process.  There's no question

4    that the statute allows, vests the director with authority to

5    remove the superintendent, and *Smith* says, and it's the only

6    word I have from a state appellate court, it's just implicit in

7    the statutory scheme that the district doesn't have to pay two

8    people to do the same job, and that makes a great deal of common

9    sense.

10         But the buyout seems to be one more step that's peculiar to

11   Dr. Hopson's situation and that may not be addressed by *Smith* or

12   the statute.  So I welcome your argument on that.

13         MR. RICHARDSON:  Initially I would say sovereign

14   immunity would apply here, and if Dr. Hopson believes he is

15   entitled to the buyout, the Claims Commission is his remedy, not

16   federal court.  I'm not sure I'm hearing a federal law violation

17   as related to the buyout.

18         Second, I don't know that we need to get to the buyout

19   because the contract that he signed provides that he can be

20   terminated for good cause, and if that's the case, he's not

21   entitled to any buyout.  Now, having -- presiding over a

22   district that gets declared in fiscal distress would seem to me

23   would be good cause to dismiss the superintendent.  When the

24   Department of Education takes the extraordinary step of

25   dismissing that superintendent, then certainly that would be

1    good cause to terminate Mr. Hopson's employment because he can

2    no longer perform the functions of his job as contemplated in

3    the contract.  He cannot fulfill his obligation under the

4    contract.

5        I guess one way to think about it is, if the roles were a

6    bit reversed and the district was seeking to force Hopson to

7    perform under his contract, he would have the same impossibility

8    the defendant does.  He would say it's impossible for me to

9    perform those functions because the department has dismissed me

10   from my job and I cannot perform those functions.  I'm

11   prohibited from that.

12           THE COURT:  I agree with you, I think, in terms of

13   performing the work as superintendent, but I'm not sure that's

14   the same question as the buyout, the premise of which is that

15   he's no longer performing the job.

16       Now, I hear you about how fiscal distress might be good

17   cause under the contract, but I haven't seen anything in the

18   record that I've been presented at this point that that -- that

19   as a matter of procedural due process, that buyout issue was

20   ventilated with notice and an opportunity to be heard, a

21   hearing, all of that.  I'm wrestling with that point.

22           MR. RICHARDSON:  Okay.  I might disagree with you a

23   little bit on the buyout.  I think the buyout only arises if

24   he's terminated without good cause.  Then he's entitled to a

25   buyout.

1      If he's terminated for good cause, then no buyout and we

2  don't have an issue here.

3          THE COURT:  I agree with that.  But doesn't there have

4  to be some kind of process to determine good cause or no?  I

5  mean, the contract incorporated the Teacher Fair Dismissal Act,

6  which normally -- which by its terms does not apply to

7  superintendents.  We know that.  But the contract said we're

8  going to apply it.  So is there no entitlement as a matter of

9  procedural due process before the property interest, if there is

10  one in the buyout, is removed for some kind of process?

11          MR. RICHARDSON:  Not as against the state because the

12  state is not a party to the contract either.  The due process,

13  the notice and a hearing, came with the identification of the

14  district as in fiscal distress.  Once that occurred, then the

15  district and Mr. Hopson were entitled to appeal that to the

16  State Board and they could have appealed it on to the Circuit

17  Court and gone all the way up to the Supreme Court under the

18  Administrative Procedures Act.

19      First of all, the state is not bound by this contract.

20          THE COURT:  So if there is a procedural due process

21  right that's in play there on good cause versus not good cause,

22  it's as against your brother Bequette's client, and the district

23  has got to deal with it in the context of impossibility and

24  everything else?

25          MR. RICHARDSON:  Yeah, I think that's fair.  But I

1   would note as well, as we pointed out, when this contract gets

2   signed by Dr. Hopson, it's subject to all the laws of Arkansas,

3   including those fiscal distress laws.

4            THE COURT:  Sure.

5            MR. RICHARDSON:  And the law that we point out says

6   that the law existing at the time of the contract becomes a part

7   of the contract as if it was terms of the contract.

8            THE COURT:  Absolutely.  But where is it in the

9   governing law that says that contracts can be voided?  Consider

10  a hypothetical:  What if the school is under a contract to build

11  a new school building and the state determines, you know, we

12  shouldn't spend the money.  That's part of the problem.  And so

13  we're going to void the contract.  Okay.  I understand that.

14  But doesn't contractor then have a claim on the contract if

15  it -- if it provides, you know, some kind of penalty or

16  liquidated damages if the school district backs out?

17       Now, as against the district, the district is going to say

18  impossibility, we can't perform because the state has told us

19  not to.  Does the contractor -- what are the contractor's rights

20  and remedies in that instance?

21            MR. RICHARDSON:  Because the governing law becomes a

22  part of the contract, then one term of the contract is that if

23  the district goes into fiscal distress, then the superintendent

24  is terminable at will at the discretion of the department.

25            THE COURT:  That's not what the statute says,

1   Mr. Richardson.  It says that he can be required to relinquish

2   all authority.  But I'm not with you on that he is suddenly an

3   employee at will and -- I'm not with you yet on he is suddenly

4   an employee at will and it's as if the contract doesn't exist at

5   all, which seems to be what you're arguing.  But I may have

6   misunderstood.

7              MR. RICHARDSON:  Well, you have a property interest in

8   your contract in Arkansas if you have -- the magic language

9   escapes me, but if you have a reasonable expectation of

10  continued employment.

11             THE COURT:  Yes.

12             MR. RICHARDSON:  Once the district is declared in

13  fiscal distress, then the superintendent does not have that

14  expectation of continued employment.  He is on notice at that

15  point that he can be sent home at any time.  The *Smith v.*

16  *Decatur* case clarifies it under Arkansas law.  That includes the

17  option to terminate his contract.

18       Now, there is one other --

19             THE COURT:  May I interrupt?

20             MR. RICHARDSON:  Yes.

21             THE COURT:  I could not have said it any better.  I

22  agree with you.  But the cases speak about continued employment

23  when the contract or the alleged contract is just about keeping

24  your job.  Right?  Quid pro quo.  You stay on, you work, you get

25  paid.  That's why I was interested in the buyout wrinkle because

1  I haven't been able to find a case that deals with that kind of

2  provision.  It seems to me facially something more than

3  continued employment.  So do you have a response beyond what

4  you've said before?

5          MR. RICHARDSON:  Let me -- if I can grab my statute

6  book real quick.

7          THE COURT:  Sure.  I'll get my copy.  And then we're

8  almost done so, I'll let you finish.

9          MR. RICHARDSON:  Okay.

10          THE COURT:  It's 6-20-1909.

11          MR. RICHARDSON:  I would back up one statute to

12  6-20-1908, subsection (f), which states the department shall

13  evaluate and make recommendations to the district superintendent

14  regarding staffing of the school district and fiscal practices

15  of the school district.

16          THE COURT:  And then binding, they are binding.

17          MR. RICHARDSON:  They are binding.  And that's the

18  letter that I provided the Court yesterday.

19          THE COURT:  Understood that that's the whole -- none

20  of this is happening except this -- but for the district being

21  in the ditch financially.  I understand that and that's what

22  brings the state into -- onto the stage.  So I understand that

23  the department has to evaluate and make recommendations and that

24  the district, once there's the declaration, has to say yes.

25  Mr. Bequette said that in his letter when he responded to

1    Dr. Hopson when Dr. Hopson wanted the money.  He said we can't

2    because the state told us not to.

3        But in terms of the powers of the director as regards to

4    that contract, isn't 6-20-1909 the key provision?

5            MR. RICHARDSON:  The letter points out both, 6-20-1909

6    and 1908.  So I think both of them apply.  They're probably the

7    only statutory provision I could point to, including that the

8    district is not allowed to incur debt without the approval of

9    the department once it's identified in fiscal distress.  But the

10   question that we're struggling here with is procedural due

11   process, and as far as a termination, you can have

12   pre-deprivation or post-deprivation process.  Pre-deprivation,

13   Dr. Hopson got that hearing before the State Board, got to air

14   his reasons why the district should not be declared in fiscal

15   distress and that the department should not have the authority

16   to terminate his employment, to dismiss him from his job.  He

17   could have taken that to the Circuit Court, Pulaski County

18   Circuit Court, and on to the Supreme Court.  So that gave him a

19   pre-deprivation opportunity to say that ADE should not have this

20   authority.

21       Post deprivation, if he feels he's been aggrieved, the

22   Claims Commission is there and available.  And if he feels like

23   he is entitled to the buyout and the state is the reason he's

24   not getting it, he can go to the Claims Commission and get that

25   heard.

1              THE COURT:  I have not looked at this as hard as I

2      need to.  My memory is, there's some kind of case law notation

3      on the applicability of the post-deprivation process, that the

4      deprivation has to have been unexpected or -- am I

5      misremembering that?

6              MR. RICHARDSON:  I'm not aware of that.

7              THE COURT:  Okay.  And maybe I am, or maybe it started

8      that way in the doctrine.  I seem to remember a case about a

9      fellow in a jail that slips on a pillow left on the stairs or

10     something like that and, you know, he's -- or maybe it's a

11     pillow stolen.  There's a pair of cases that came out when I was

12     in law school.  But your point is, to the extent there is a

13     constitutionally protected property interest in the buyout, like

14     on takings, the answer is, go to the Claims Commission,

15     Dr. Hopson.  That's the way you come to the state and seek money

16     from us for this.

17             MR. RICHARDSON:  Right.  Right.  And it seems like

18     we're together on continued employment.  The state has the -- it

19     seems like we're agreed that the state has the authority to

20     dismiss the superintendent and direct that he no longer be

21     employed or paid under the contract for continued employment.

22     The only question would be the buyout, is he entitled to the

23     buyout, and he could have gone to the Claims Commission the day

24     after if he felt he was entitled to that.

25             THE COURT:  Can he still go?

1      MR. RICHARDSON:  I'm not sure.  There are statutes of

2  limitation that apply to Claims Commission, so I'm not really

3  ready to opine whether he could go today.  I think as long as

4  this lawsuit was pending, the Claims Commission would defer

5  until this was resolved, because generally at the Claims

6  Commission, you have to exhaust your other avenues before

7  they'll take it up.  And since this lawsuit is pending, I don't

8  think they would take it today.

9      THE COURT:  I took up a lot of the time I allotted you

10  with questions.  That's the hazards of the job.  Do you have a

11  concluding thought or point you want to make?

12      MR. RICHARDSON:  Just that, again, this is an action

13  on the contract and I think it's very well-settled law that the

14  state is immune from an action on the contract.  I think the

15  statutes combined with the *Smith v. Decatur* case makes the

16  qualified immunity defense just certain.  They were statutorily

17  authorized to take -- the commissioner was statutorily

18  authorized to take the actions that he did, *Smith v. Decatur*

19  suggests that there's nothing unlawful about it, and there's

20  been no law that I've seen cited yet saying that whatever rights

21  that Dr. Hopson is asserting were clearly established as to the

22  actions that Dr. Kimbrell took.  So I think the qualified

23  immunity defense is pretty well decided.  I'm not hearing that

24  there's really much question about that.  If there is, we can

25  discuss that as well, but the only question I'm getting from the

1   Court is about the buyout, and I think Claims Commission answers

2   that one.  If he felt like he was entitled to that buyout and he

3   felt like the state was standing in the way, which it was, he

4   could have gone to the Claims Commission.

5          THE COURT:  Thank you, Mr. Richardson.

6      Mr. Bequette?

7          MR. BEQUETTE:  Your Honor, may I speak from the table

8   or would you like me to come forward?

9          THE COURT:  You're welcome to speak from there.  Just

10  please stand and I'll hear you.

11         MR. BEQUETTE:  I'll go ahead and come up here to the

12  podium, your Honor.

13     I represent Dr. Jerry Guess as the current superintendent

14  of the Pulaski County School District, your Honor, and I just

15  wanted to initially state that we join in the state defendants'

16  arguments as set forth in the papers and also in

17  Mr. Richardson's arguments.

18     I'll focus principally, I think, on the quasi contract and

19  unjust enrichment claims since I think the other claims are

20  fairly straightforward and well briefed in the papers.

21     My initial statement to the Court is that as to

22  Dr. Hopson's claims against the district, Dr. Guess as the

23  superintendent of the district, I would state that *Smith v.*

24  *Decatur* is dispositive of those claims.  Simply stated, what

25  happened here was that the State Department of Education told

1    the district or told Dr. Hopson that he was to relinquish his

2    position and instructed the district not to pay him any further

3    funds.  And so the district under the fiscal distress statutory

4    scheme has to abide by that since it's in fiscal distress and

5    the Commissioner of Education operates, you know, in the stead

6    of the school board here because the commissioner also took the

7    other extraordinary step of removing the elected school board,

8    and the commissioner acts in the stead of the elected school

9    board, so --

10          THE COURT:  Y'all had no choice in the matter.

11          MR. BEQUETTE:  That's correct.  So *Smith v. Decatur* is

12   dispositive, and I would join in Mr. Richardson's comment that,

13   really, as to any claim against the state for money based on

14   what the state did in requiring Dr. Hopson to relinquish his

15   position and instructing the district not to pay, it is --

16   Dr. Hopson would have to go to the State Claims Commission.

17          THE COURT:  Do you agree that I can consider the

18   attachments to the complaint in ruling on this motion to

19   dismiss?  I mean, we're drifting into the letters back and forth

20   and the contract document.  Are all of those embraced within the

21   pleadings?

22          MR. BEQUETTE:  I believe they are.  I believe they

23   are.  The contract clearly incorporates Arkansas law.  In three

24   separate, specific provisions, in addition, it's well-settled

25   that Arkansas law, the contract -- you know, that the contract

1   when it's made, the law in effect at the time is part of the

2   contract.  But Sections 1, 3, and 17 specifically incorporate

3   Arkansas law, which we contend under *Smith v. Decatur*, you know,

4   you have that statutory scheme that we contend allows the

5   department to require Dr. Hopson or any other superintendent in

6   a school district that's identified as being in fiscal distress

7   as having to relinquish that position.  And we believe when you

8   read 1908 and 1909 together, that it does allow the department

9   to tell the district or to instruct the district not to pay the

10  superintendent that's been required to relinquish the position

11  any further pay.

12          THE COURT:  I think the statute is fairly clear about

13  that, and there's the *Smith* case interpreting the statute.

14          MR. BEQUETTE:  Yes, sir.

15          THE COURT:  But if -- go the next step with me, that

16  if the district was in an impossible condition and could not

17  perform on the contract because Dr. Kimbrell in his judgment,

18  considering all of the circumstances, said don't, do not do

19  this, doesn't that then as a matter of state law at least create

20  a plausible quasi contract claim?  That is, the paradigm

21  situation for those kinds of claims is where the contract, the

22  parties have a contract, but it cannot be performed because of

23  impossibility or impracticability, it's sometimes called, or

24  it's void as against public policy or something.

25          MR. BEQUETTE:  Yes.

1          THE COURT:  So as a matter of state law, does

2    Dr. Hopson not have a claim against the district?

3          MR. BEQUETTE:  I think he would if we ignored the

4    applicable fiscal distress statutory scheme.  You know, none of

5    the cases that either the Court refers to, the *Applied Pharmacy*

6    case, and then there was a case that Judge Deere decided back in

7    2010 and then a case you decided back in 2012, or earlier this

8    year, rather, on the unjust enrichment and quasi contract claim,

9    you know, none of those cases had this variable, which is the

10   fiscal distress statutory scheme that in our view and obviously

11   the Arkansas Court of Appeals's view trumps those type claims.

12   Because it's my understanding that this type of a quasi contract

13   claim was asserted in the *Smith v. Decatur School District*.

14   It's not mentioned in the opinion either by the Court of Appeals

15   in its opinion addressing the merits or in the Arkansas Supreme

16   Court's decision to deny the motion for rehearing or petition

17   for review.  But it's my understanding that Superintendent Smith

18   made those claims and the Court of Appeals rejected them without

19   even addressing them.

20          THE COURT:  Fascinating.  So it's covered in the

21   briefs?

22          MR. BEQUETTE:  I think it was.

23          THE COURT:  I'm struck by this -- by the statutory

24   provisions that your brother Richardson and I were talking

25   about, in particular 6-20-1909(a)(6) where the director, the

1  Department of Education, really, but acting through the

2  director, can take any other action allowed by law that is

3  deemed necessary to assist the school district in removing

4  criteria of fiscal distress.

5      That's a very broad provision, but it's any other action

6  allowed by law, so I pause on those words, allowed by law, and

7  the other doctrines that may be in play when the Department of

8  Education takes extraordinary steps like we're taking in this

9  case.

10          MR. BEQUETTE:  That's correct.  And I would agree with

11  the Court that allowed by law is the operative phrase there.  My

12  comment on that would be, you know, allowed by law, see *Smith v.*

13  *Decatur*.  You know, you have to look at *Smith v. Decatur*, and as

14  to the school district and Dr. Hopson, it's simply a matter of

15  the school district simply did as it was told under the

16  statutory scheme.

17          THE COURT:  Okay.  Thank you.

18          MR. BEQUETTE:  Thank you, your Honor.

19          THE COURT:  Mr. Hicks, you've been biding your time

20  patiently.  Your turn.

21          MR. HICKS:  Thank you, your Honor.  May it please the

22  Court, co-counsel.  I will not belabor all of the time trying to

23  go through all of the issues that are in the brief.  I think

24  they are very well pled out, but I will try to address some of

25  the issues raised here today by opposing counsel.

1        First of all, when we make the assertion in our complaint

2   that Mr. Kimbrell consulted with Governor Beebe in his

3   decisions, we are not just merely talking about the decision to

4   declare the district in fiscal distress.  We are also alleging

5   that he consulted the Governor about termination of Dr. Hopson's

6   contract and ultimately making the decision to treat that

7   contract as null and void.  I do not believe the law allowed

8   them to declare his contract null and void.

9            THE COURT:  May I interrupt?

10           MR. HICKS:  Yes, your Honor, please.

11           THE COURT:  I think at this point in the case because

12  we're on motions to dismiss, the Court has to accept the well-

13  pleaded allegations in your complaint as true.  So let's assume

14  that Mr. Kimbrell had long talks with the Governor about the

15  district and about whether Dr. Hopson should stay in charge of

16  it or somebody else should stay in, whether the school board

17  should be absolved, whether any money should change hands, any

18  of those things.  Dr. Kimbrell works for the Governor.  They all

19  work for the people of Arkansas, of course, but the Governor is

20  his boss.  And so I'm not sure what's untoward or improper about

21  the allegation that the state's chief executive consulted with

22  the head of a cabinet department on a decision of this

23  magnitude, about a school district this big and with problems of

24  this size.

25           MR. HICKS:  I don't -- we're not alleging, your Honor,

1    that there is a problem with the consultation.  I think it's

2    reasonable, and that's part of our allegation.  It is reasonable

3    that he would consult with his boss.  The allegation here is

4    that when they try to separate the Governor from these actions,

5    the actions of -- which we contend are improper, not only

6    improper, but what we contend are unconstitutional, to terminate

7    Dr. Hopson without due process of law, without hearing, as well

8    as to treat the buyout provision of his contract as null and

9    void.  The law does not allow that.

10        And all we are saying here is that not only was Kimbrell a

11   state actor in this measure, but so was the Governor a state

12   actor because I do not believe that Kimbrell would take these

13   measures without consulting with the chief of the state.

14            THE COURT:  I think I understand.  If I could, can we

15   break out those two, the two issues you just raised?

16            MR. HICKS:  Sure.

17            THE COURT:  Why did -- let me put it another way:

18   Would you agree that as the district was going through the

19   fiscal distress process, that is, the department's -- at the

20   staff level, the recommendation, and then the Board of Education

21   hearing about that, isn't that process, wasn't it adequate as to

22   Dr. Hopson's continued employment, given the law that everybody

23   knew about, the old law that if the district is in fiscal

24   distress, the director can tell the superintendent goodbye for

25   whenever the director thinks it's best?

1          MR. HICKS:  Absolutely not, and the reason not is

2    because, number one, during the hearings for the fiscal distress

3    status, Dr. Hopson had not even been terminated, and, frankly,

4    due to the discussions that were going on, had no idea he was

5    going to be terminated.  The discussions that were going on had

6    previously been this district is too big for us to take over,

7    but we will work with the district to make recommendations about

8    how to correct some fiscal problems, how to deal with things,

9    and Dr. Hopson had not been put on notice that he would be

10   terminated.

11        He was not terminated until June 20.  These hearings were

12   held back in May.

13        Not only that, your Honor, but nothing in the record gives

14   any indication that anybody gave him an opportunity to be heard

15   about a termination.  These hearings were about declaring the

16   district in fiscal distress.  And the statutes, under the

17   statutes, when a district is declared in fiscal distress, the

18   statutes do not demand that the state come in and remove the

19   superintendent.  They don't have to.  They have the authority

20   to, but they don't have to.  But they can.

21          THE COURT:  Isn't it at the director's option?

22          MR. HICKS:  Yes, it is.  It is at the director's

23   option.

24          THE COURT:  And do you agree, Mr. Hicks, that this

25   statutory scheme about fiscal distress, that that is -- inheres

1    in the contract that we have here?

2              MR. HICKS:  Yes.

3              THE COURT:  In other words, the contract is made

4    against that background; right?

5              MR. HICKS:  I agree with that.

6              THE COURT:  And the director has under the statute the

7    authority to say to the superintendent, relinquish all power.

8    Likewise, the director has the authority to keep the

9    superintendent on and the director has the authority to dissolve

10   the school board or leave it in.  I mean, there are various

11   options.  Yes?

12             MR. HICKS:  That's exactly right.  The safeguard that

13   Dr. Hopson had, however, was that he had negotiated a contract.

14   There had been exchange of mutual promises and exchange of

15   consideration, and he had a contract that had a buyout provision

16   that basically stated, if you are terminated without cause,

17   here's your buyout provision and your protection.  The state

18   null and voided that.

19        So when Dr. Hopson is at the fiscal distress hearings, even

20   though it's plausible that he could be terminated under the

21   statute, the fiscal distress statutes say nothing about having

22   the authority to terminate or having the authority to totally

23   violate years of precedent of contract law.  He had no idea of

24   that.

25             THE COURT:  Do you think that if the state decides

1    that a district is in fiscal distress, that there are

2    extraordinary circumstances there, and so the state

3    essentially takes over, and is the state at that point stuck

4    with whatever the district's contractual obligations are, no

5    matter how -- how large or how detrimental to the district's

6    goal of educating these children?  Or what's the lay of the land

7    at that point?

8              MR. HICKS:  I think the state after taking over the

9    district has a responsibility to the taxpayers to exercise

10   fiscal control, but there has to be some kind of procedural due

11   process in place, some kind of mechanism to determine which

12   contracts are plausible, which contracts are reasonable, and

13   which contracts maybe not.  There could have been a contract in

14   place where there may have been a superintendent contract that

15   would pay a million dollars a year.  That certainly would have

16   been out of line, but there at least should have -- should have

17   at least been some kind of procedural process in place to make

18   that determination.  That has not been afforded Dr. Hopson.

19             THE COURT:  So you'll agree with me that it's not --

20   as I read your pleading, there's no substantive due process

21   violation alleged.  That is, you don't allege, Dr. Hopson

22   doesn't allege that the buyout couldn't be taken away as a

23   matter of the Constitution; rather, it could be, but there has

24   to be process before it is.

25             MR. HICKS:  There has to be some kind of process, and

1  in this case, we make the allegation there was no process.

2  THE COURT:  What about your brother Richardson's point

3  on post-deprivation process, that Dr. Hopson had the

4  opportunity -- after the state directed Mr. Bequette's clients

5  not to pay, that Dr. Hopson had the opportunity to go to the

6  Claims Commission or perhaps even to go to the director and say

7  I'm entitled to a hearing about whether the buyout is paid or

8  not, I'm entitled to some public determination on this point

9  that your brother Richardson raised of good cause or no cause

10  that's kind of lurking over here.

11  MR. HICKS:  From a practical matter, that could not

12  have happened.  I have litigated many cases before the Arkansas

13  State Claims Commission.  It is most definitely by statute and

14  by operation a tribunal of last resorts, and one of the first

15  things that they -- the hurdle that they will overcome is, do

16  you have any claims that could be brought in state court or

17  federal court?  And until you resolve those, we're not hearing

18  anything.  I have four cases pending before the Claims

19  Commission now that are in abeyance because they said you've

20  first got to go to court and make sure they can't do anything.

21  And until that time, Dr. Hopson would not -- we could have filed

22  that claim.  It would be sitting there held in abeyance now and

23  we would be right here doing what we're doing because it is very

24  clearly a venue of last resort.

25  THE COURT:  Okay.  I understand that as a matter of

1    how the world works.  But it is a venue, isn't it?  It is a

2    forum and a procedure for someone with a claim against the state

3    to come in and say I have been injured and I have law on my side

4    and there is no remedy for me elsewhere because of the peculiar

5    circumstances.  Look at this buyout.  It was reasonable.  I was

6    not part of the problem.  I was part of the solution.  I'm

7    entitled to the buyout.  Couldn't Dr. Hopson do that?

8            MR. HICKS:  He could do that and I think that the

9    State Claims Commission is a forum.  But, like I said, as a

10   practical matter, it's a forum of last resort and the Claims

11   Commission would not hear this case.  Even if it's filed, they

12   would not hear this case until other remedies have been

13   exhausted.

14           THE COURT:  Okay.  I understand.  And I guess that's

15   your -- what about on the takings issue?  Is that your view

16   there as well?

17           MR. HICKS:  Yes, yes.

18           THE COURT:  Okay.  How about on impossibility, the

19   impossibility of the district performing when the state is

20   running the school district, essentially?  Dr. Kimbrell is

21   in place of the school board and he's hired Dr. Guess to do

22   things, and Dr. Kimbrell says, district, you may not write any

23   checks.  Isn't performance by the district under the contract

24   impossible?

25           MR. HICKS:  I think given those parameters it is

1  impossible.  But the question I think more aptly becomes was the

2  state within the law by saying to the district you cannot pay

3  him?  I think the statutes do not give them that authority.  The

4  statute, as you correctly stated earlier, only allowed them to

5  take actions that are permitted by law.  And I do not think that

6  the *Decatur* case gives them the permission to do this.  The

7  *Decatur* case, when *Smith v. Decatur* -- first of all, that was a

8  termination for cause, and, yes, the district -- the state did

9  come in and take over the district, but that was a contract that

10  did not have a buyout provision, there had been no exchange of

11  mutual promises concerning a buyout, and the Supreme Court even

12  mentions that, that they can't address that issue because that's

13  not before them.  They can only address the issue before them,

14  and Smith was asking for his job back.  Dr. Hopson is not asking

15  for his job back.  He is not asking to go and function as a

16  superintendent while Dr. Guess is also functioning as a

17  superintendent.

18          THE COURT:  I think Mr. Smith wanted his job back or

19  the rest of his salary under the contract, one or the other;

20  right?

21          MR. HICKS:  Right.

22          THE COURT:  And the Court of Appeals, speaking through

23  Judge Gruber, said no, they've hired another superintendent and

24  they don't have to pay twice.  That seems a very practical

25  construction of the statute to me.

1        MR. HICKS:  Well, it's not very practical when you

2    consider the fact Smith did not contemplate being removed and

3    had a buyout provision in his contract.  Dr. Hopson did.

4        THE COURT:  I'm with you that Dr. Hopson's contract is

5    different than Smith's, and, in particular, on the buyout.  But

6    in terms of the job, I think there are similarities there

7    because you've got a term contract and you've got a salary set.

8    Before the term expires, the director comes in under the statute

9    and says, superintendent, relinquish all administrative

10   authority.  And then a new interim superintendent or acting

11   superintendent is hired.

12       So that far it seems to me *Smith* is very close to our case.

13   What's different is, as you point out, what Dr. Hopson

14   negotiated as this fail-safe provision of the buyout.  And I

15   don't see that present in *Smith*.

16       MR. HICKS:  And that's why I think this distinguishes

17   Dr. Hopson's case.  That issue within itself, to take the *Smith*

18   case further, to say that that also means that they can null and

19   void his entire contract and the buyout provision I think is

20   impermissible under the law.

21       THE COURT:  Have you found any cases about procedural

22   due process involving a contract with a buyout?

23       MR. HICKS:  I found a couple, your Honor, but they're

24   not exact.  These may be cases that you've also looked at, the

25   case of *Lewis D. Holloway v. Bentonville School District*, and

1   that was an Eighth Circuit case, the case is 277 F.3d 1035.

2       In that case, Lewis Holloway was a superintendent of the

3   Bentonville School District, and it was the action of the school

4   board, not fiscally taken, but it was action of the school board

5   in a 2002 case that terminated him with two years remaining on

6   his contract.  The Eighth Circuit went on to rule, number one,

7   of course, Smith -- not Smith, but Holloway sued for the taking

8   of his contract and basically under the same issues that

9   Dr. Hopson is alleging here.

10          THE COURT:  No procedural due process?

11          MR. HICKS:  No procedural due process and not honoring

12  the contract itself.  And the Eighth Circuit held that the

13  superintendent had a property interest in his employment

14  contract, which is the same allegation we are making here.

15          THE COURT:  Did they hold continued employment or

16  employment contract?

17          MR. HICKS:  No, he had a property interest in his

18  contract.  Did not have a right to continued employment.  And he

19  was deprived of that property interest when the board voted to

20  buy out the remaining two years of his contract.  The issue

21  there is, they at least bought out his contract and that he was

22  not deprived of his property interest when the board voted to

23  buy out the remaining two years of his contract.

24      It is our contention here that because Dr. Hopson's

25  contract was not bought out or the buyout provision was not

1   upheld, he has been deprived of his property interest because of
2   what this case says.
3           THE COURT:  Without adequate process.
4           MR. HICKS:  Without adequate process.
5           THE COURT:  Without a meaningful hearing and a chance
6   to be heard.
7           MR. HICKS:  Exactly.
8           THE COURT:  Again, I think you agree that at the end
9   of the day, he could lose the buyout if there was process and
10  somebody decided good cause or no good cause.
11          MR. HICKS:  I think that that's plausible, but, again,
12  there would have to be some due process laid out in order to do
13  that.
14          THE COURT:  All right.  I have not read *Holloway*, or
15  at least if I have, I don't remember it and it's not in my stack
16  of cases, so I look forward to reading it.  Is there another one
17  or is that the --
18          MR. HICKS:  There is a case also, it's not on all
19  fours, but it is a similar case, *Joseph F. Moore v. Warwick*
20  *Public School District*, 794 F.2d 322.  It's another Eighth
21  Circuit case out of North Dakota where there was a
22  superintendent of a school district there who was blind and his
23  eyesight was getting worse, and with several months remaining on
24  his contract, the school district terminated his contract
25  without any procedural due process, as well as no payment for

1    the remainder of his contract.

2        The Eighth Circuit -- the lower court ruled that he had

3    been granted some kind of procedural due process, but the Eighth

4    Circuit reversed it and basically held that he had not been

5    granted proper due process under his contract and he indeed had

6    a contract right in the remaining term on his contract.

7        I mention those cases to say that's the law in the state.

8    A contract is a property right, and if you're going to terminate

9    that contract, not only merely terminate it, I don't think there

10   is any law that allows a state to declare that that contract and

11   its buyout provision is null and void, not without some kind of

12   process to do that.

13       Certainly there has not been any process here to do that,

14   and I take strong issue that this case is on all fours with the

15   *Smith v. Decatur* case because of the -- that very issue, that

16   Hopson's case had a buyout provision.

17            THE COURT:  A couple of questions, Mr. Hicks.

18            MR. HICKS:  Yes, sir.

19            THE COURT:  Mr. Bequette mentioned that he thought

20   this quasi contract claim may have been in Smith against

21   *Decatur*, too, just not addressed by the Court.  Do you know

22   anything about that?

23            MR. HICKS:  I've read the briefs and read the cases,

24   and, of course, Mr. Bequette is probably a much more in-depth

25   reader than I am, but I don't remember reading anything about a

1    quasi contract in the *Smith v. Decatur* case.

2            THE COURT:  I didn't remember reading it either, so

3    thank you on that.  Secondly, do you agree that in terms of

4    jurisdiction that there is no diversity jurisdiction and for the

5    case to stay here, Dr. Hopson has to have a plausible federal

6    claim?  Then if he does, there are -- I could exercise -- the

7    Court could exercise supplemental jurisdiction over any state

8    law claims that remain?

9            MR. HICKS:  Yes, your Honor.  Dr. Hopson is a citizen

10   of Portland, Oregon; however, the defendants that are involved I

11   think under the law are not contended to be citizens, they are

12   state actors and state agencies.  So I do agree with that.  But

13   I do believe that this Court has jurisdiction because of the

14   federal questions involved.

15           THE COURT:  Yes.  But Dr. Kimbrell and the Governor,

16   they are the state for purposes of the --

17           MR. HICKS:  Yes.  I agree.

18           THE COURT:  Is there anything else that you would

19   leave me with, Mr. Hicks?

20           MR. HICKS:  Well, what I would leave you with, your

21   Honor, also in addition to this, to all of the issues that we've

22   pled and have talked about here today, I think also that there's

23   the very important issue that we haven't quite gotten into, a

24   well-established principle in common law of estoppel and

25   detrimental reliance.  Dr. Hopson negotiated at length and

1    originally turned this job down until he was given some

2    assurances that the district has been determined by the state

3    that it is in fiscal distress, but it's too big to take over.  I

4    think there were even some articles in the paper that stated

5    that.

6         THE COURT:  Is that the phone call alleged where

7    Dr. Hopson reaches out to Director Kimbrell and says, you know,

8    I'm concerned about this?

9         MR. HICKS:  Exactly.  And that is one of the reasons

10   why there was a negotiation between Dr. Hopson's representative

11   and Mr. Bequette about the buyout provision.  This man picks up

12   his family and leaves a very safe and secure job in Portland,

13   Oregon, to come back home and help a district in the state of

14   Arkansas and negotiates a buyout that in the event these matters

15   happen, I will have a buyout provision.  And I think it is

16   without question that every party involved, including the school

17   district, well intended that if the district was taken over and

18   Dr. Hopson was terminated, that they would certainly pay under

19   the buyout provision.

20       Dr. Hopson went through an enormous amount of life-

21   changing moves to get here and to do this, and I think it would

22   be wholly unjust to just simply say, okay, you came.  We don't

23   want you now.  Goodbye.  And I don't think that it's plausible

24   as well to conclude that Dr. Hopson after only being on the job

25   for ten months had some kind of contribution to the fiscal

1    distress of the district.  That allegation had not been made

2    until just yesterday when I took a look at the pleading that

3    Mr. Richardson had delivered.  In none of the letters that have

4    been exchanged has there ever been any allegation that

5    Dr. Hopson had dirty hands at all in making any contribution to

6    this.

7              THE COURT:  I take it your point would be, whether

8    that's true or no, we don't know, and there should be a process

9    to sort that out, at a minimum.

10             MR. HICKS:  That is exactly our position.

11             THE COURT:  I didn't know, Mr. Hicks, that Dr. Hopson

12   was an Arkansas native, that he came home.

13             MR. HICKS:  He is.  He grew up in Prescott, Arkansas,

14   and was mostly educated in Arkansas schools, attended the

15   University of Central Arkansas.

16             THE COURT:  And now this estoppel, detrimental

17   reliance argument, as you've pleaded it, that's a matter of

18   Arkansas law, is it not?

19             MR. HICKS:  Yes, it is.

20             THE COURT:  All right.

21             MR. HICKS:  One last thing, your Honor.  I just have

22   to say, I take strong issue and I think that it's a rather far-

23   out argument for the Attorney General's representative to say

24   that Dr. Hopson was not performing his duties and can be

25   terminated for cause because he was not performing his duties

1   because the state removes him.  I don't think that's what the

2   language of the statute contemplated when -- or his contract

3   when it talked about for cause and it talks about failure to

4   perform his duties and responsibilities.  I don't think they

5   were contemplating at that time that that also meant the state

6   preventing him from serving as a superintendent and then using

7   that as the reason for cause to terminate him.

8          THE COURT:  I understand.  I didn't see anything in

9   the contract where the parties at least put in words any

10  intention about what would happen if the state put the district

11  in fiscal distress.  Did I overlook that?

12         MR. HICKS:  No.  There was no specific language about

13  that, and the closest thing is just simply the buyout that says

14  if you are terminated without cause, here's what we will do in

15  terms of compensating you.

16         THE COURT:  Understood.

17         MR. HICKS:  Thank you.

18         THE COURT:  Thank you, Mr. Hicks.

19         MR. HICKS:  Thank you, your Honor.

20         THE COURT:  All right.  Mr. Bequette, I'll let you go

21  first in terms of rebuttal because I like your style of

22  rebuttal.  It's usually very -- and I'll let Mr. Richardson

23  close.  Do you have anything?

24         MR. BEQUETTE:  Very good.  It will be very short, your

25  Honor.  I just have three observations.  One is that we just

1  don't believe that, you know, an unjust enrichment or a quasi

2  contract claim fits here because it's just typically unavailable

3  when you've got a written contract, which here expressly

4  incorporates the provisions of Arkansas law that we spent a lot

5  of time talking about, the fiscal distress provisions.

6       Secondly, if these fiscal distress statutes passed, enacted

7  by the legislature, allow the department to require a

8  superintendent to relinquish his position and allow the

9  department to direct a school district not to pay any further

10  monetary compensation to that superintendent, then the notion

11  that a quasi contract or unjust enrichment claim could be

12  allowed to proceed seems to be quite at odds with that, with

13  that principle, if the Court finds that those fiscal distress

14  statutes allow the department to do those things.

15            THE COURT:  But the statute speaks in terms of the

16  director having the power to take any other action allowed by

17  law.

18            MR. BEQUETTE:  Correct.

19            THE COURT:  And the law of restitution is part of the

20  law of Arkansas, isn't it?

21            MR. BEQUETTE:  Well, that's true.  That's true.  But,

22  again, and that goes back to a comment I made earlier, which

23  was, you know, I don't think -- none of the cases, at least the

24  ones I've seen decided recently here in federal court in

25  Arkansas, about quasi contract and unjust enrichment, none of

1    them dealt with this unusually -- this statute we have, the

2    fiscal distress statute, that statutory scheme.

3            THE COURT:  I take your point there.  I don't know of

4    a case that involves this kind of plenary authority on the part

5    of a state official or a state department.

6            MR. BEQUETTE:  Right.

7            THE COURT:  So that's -- that's a tangle.

8            MR. BEQUETTE:  Those were my final thoughts, your

9    Honor.

10           THE COURT:  Thank you, sir.  Appreciate it,

11   Mr. Bequette.

12      Mr. Richardson.

13           MR. RICHARDSON:  I'll finish up from here.

14      As far as the Claims Commission and its jurisdiction, it

15   extends to claims where the state has immunity, we've alleged

16   the state has immunity here, so I don't see that I could take a

17   different position before the Claims Commission, so -- and I

18   don't think, while you do have to exhaust other judicial avenues

19   if you have them, if you don't have them, if you're claiming the

20   Court would not have merit, then I don't think you have to

21   exhaust it.

22           THE COURT:  That's the point, isn't it, that the

23   commission is there when there is no other available forum?

24           MR. RICHARDSON:  Right.  Because of the state's

25   immunity, the commission is there to provide some compensation,

1   and it's essentially a legislative decision about, you know, do

2   we think this person was harmed, and if so, what will the state

3   pay them to rectify that harm?  It doesn't really function like

4   a court, but it's there because the state has a need to provide

5   a remedy for people who believe they've suffered deprivation at

6   the state's hands.

7          THE COURT:  Yes.  The state provides this

8   administrative mechanism as sort of a do-right opportunity, it

9   seems to me.

10         MR. RICHARDSON:  I think that's fair.

11         THE COURT:  Okay.

12         MR. RICHARDSON:  The quasi contract claim, we've

13  talked about it, I'm not sure what kind of quasi contract claim

14  we're talking about.  The one that's pled in the complaint is

15  promissory estoppel and I think we've dealt with that.  And I

16  didn't read the complaint to really mention the buyout.  I did

17  think that was important to point out here, but as I read the

18  complaint, it was really you should have left me in my job, and

19  the promissory estoppel was, Dr. Kimbrell, you are estopped from

20  removing me as superintendent because of the representations

21  that you've made.  But I don't think that that estoppel could

22  get around the clear statutory authority to remove the

23  superintendent.

24         THE COURT:  I thought the argument had evolved through

25  the briefing when you made such a strong case under *Smith* and

1    that the letter of the statute of reinstatement is just not

2    going to happen, so then there's the fallback position, the,

3    well, if I can't be reinstated, I'm at least entitled to the

4    buyout.  That's what the contract says, and if the contract is

5    not enforceable, then there is some quasi contract, some

6    obligation implied in law for the state to fulfill that buyout,

7    as a matter of Arkansas law.

8            MR. RICHARDSON:  Well, which -- yeah, I think that's a

9    state law claim, but, you know, I guess I just close out with

10   the *Smith* case where it says, the Arkansas Court of Appeals says

11   that the superintendent there argued that 6-20-1909 does not

12   allow ADE reconstituting the district to terminate, cancel,

13   void, or otherwise breach contracts.  However, Section 6-20-1903

14   in defining reconstitution includes removal of a superintendent

15   as one of ADE's options.  We believe it is implicit in the

16   statutory scheme that ADE does have the authority to terminate

17   superintendents' contracts.

18       You know, I think that's the Arkansas Court of Appeals

19   expressing clearly that the statutory scheme here does have,

20   does grant the department the power to instruct the district not

21   to pay, to void the contract and say this contract no longer

22   applies and you may not pay him anything under this contract

23   because we've decided this contract is void.

24           THE COURT:  But *Smith*, you'll agree with me, was a

25   continuing employment case; right?  No buyout in play?

1          MR. RICHARDSON:  Well, I mean, this -- this complaint

2    is a continuing employment complaint, but, yeah, he didn't have

3    a buyout there, but the Court of Appeals did not qualify it with

4    reference to a buyout or some other remedy.  They say the

5    statute -- implicit in the statutory scheme is that ADE does

6    have the authority to terminate the contract.  And it talks

7    about in terms of terminate, cancel, void, or otherwise breach.

8          THE COURT:  I understand.  You don't think the

9    buyout -- the state defendants do not believe that the buyout

10   makes any legal difference, that it's the contract as a whole,

11   look at the contract as a whole, and I understand.  I'm not sure

12   that's --

13         MR. RICHARDSON:  I guess I could point out, too, that

14   the contract as to PCSSD provided the process of Teacher Fair

15   Dismissal Act, which would have allowed Dr. Hopson to ask for a

16   hearing on his termination within 30 days.  That never happened.

17   He never asked for a hearing afterwards.

18        Now, after the district was found to be in fiscal distress

19   by the State Board, he did come back to the State Board and made

20   some comments to the State Board.  So, you know, perhaps there

21   was an opportunity for him to come before the State Board again

22   and say, wait a minute, I shouldn't have been terminated here.

23   Part of the problem in this case with Dr. Hopson is that once he

24   was terminated, he simply walked away.  He never asked for any

25   further hearings, any process, never filed anything with the

1    Claims Commission, anything.  He just walked away.

2            THE COURT:  But he asked the district to be paid and

3    Mr. Bequette wrote and said no.

4            MR. RICHARDSON:  Because the state had instructed the

5    district not to pay.  But he didn't ask for a hearing on that.

6    He didn't -- he didn't invoke the Teacher Fair Dismissal Act.

7    He didn't go to the Claims Commission to get a hearing on what

8    he should be paid.

9            THE COURT:  I misunderstood your point.  It was

10   whether -- I got it now.  It was whether Dr. Hopson pursued any

11   of this process.

12           MR. RICHARDSON:  Right.

13           THE COURT:  Understood.

14           MR. RICHARDSON:  I guess I'm sort of making a waiver

15   argument.

16           THE COURT:  I get it.

17           MR. RICHARDSON:  All right.  Unless you have further

18   questions, I'll sit down.

19           THE COURT:  No questions.  Thank you, Mr. Richardson.

20           MR. RICHARDSON:  Thank you, your Honor.

21           THE COURT:  And all counsel, I appreciate your coming

22   in and your help this morning.  I'm getting -- I have a better

23   understanding of the issues and the arguments because of the

24   conversation.  I know it was on short notice and that y'all have

25   many other things to do.  Thank you for coming in.

1          MR. HICKS:  Thank you, your Honor.

2          THE COURT:  Court is in recess.

3      (Proceedings adjourned at 10:17 a.m.)

4

5

6                  REPORTER'S CERTIFICATE

7      I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

8

9
                            Date:  September 11, 2012
10  /s/ Christa R. Jacimore, RDR, CRR, CCR
        United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25